**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARCUS AUGUSTUS JOHNS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 07-cv-0530 |
| | ) | |
| AMTRAK POLICE UNIT, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Amtrak Police Unit's motion for summary judgment [77].
For the reasons set forth below, Defendant's motion is granted.

**I.      Procedural Background**

Plaintiff, Marcus Augustus Johns, acting *pro se*, filed a complaint on or about February
23, 2006 in the Circuit Court of Cook County.  See [1].  Defendant was not served; the claim was
dismissed.  See *id.*  On December 7, 2006, the dismissal was vacated and Plaintiff filed an
amended complaint, alleging violations of the Americans with Disabilities Act (and of his
constitutional rights) stemming from his September 2005 arrest by Amtrak police officers.  See
*id.*  The action was removed (*id.*), pursuant to 28 U.S.C. §§ 1331, 1349, and 1367, to the
Northern District of Illinois, Eastern Division, where it initially was assigned to Judge Moran.

 Plaintiff amended his complaint on multiple occasions.  [13], [39].  Defendant filed its
answer [54] on December 13, 2007.  On March 11, 2008, Plaintiff filed another amended
complaint [70], but it did not seek leave to file the pleading and in any event it appears to be
identical to the earlier amended complaint [39].  Therefore, the Court will disregard the March
11, 2008, filing.  *Cf. Dale v. Poston*, 548 F.3d 563, 568 (7th Cir. 2008) ("Judges * * * must

construe *pro se* pleadings liberally * * * [b]ut procedural rules cannot be ignored") (citation omitted).

"Amtrak Police Unit" is the only remaining defendant in this action. National Railroad Passenger Corporation has answered as the named Defendant in this case, stating that it was "incorrectly sued as Amtrak Police Unit," but not raising any objection to the apparent misnomer or alleging any prejudice. See 2 MOORE'S FEDERAL PRACTICE § 10.02[2][b], at 7-9 (3d ed. 2001). In addition to Defendant Amtrak Police Unit, however, Plaintiff refers in the body of his complaint (¶ 3) to defendant "Michael Columbo" a police officer who, it now appears, is actually named Richard Fedorchak. (Michael Columb*o*, as discussed in the facts section of this opinion, is actually Michael Columb, a building engineer.) Officer Fedorchak has not been served with process, and Defendant's Answer (see ¶ 3) put Plaintiff on notice that "Michael Columbo" is not an Amtrak police officer and was never served with process.

Plaintiff has not sought leave to amend his complaint in order to add Fedorchak as a defendant, despite apparently becoming aware of his true identity.[1] Federal Rule of Civil Procedure 10(a) specifies that the "title of the complaint must name all the parties." Because Plaintiff has not done so, Fedorchak is not a party to this action. See *Moran v. Commanding General of U.S. Army Fin. Ctr.*, 360 F.2d 920, 922 (7th Cir. 1966); c*f. Ferdik v. Bonzelet*, 963 F.2d 1258, 1261-62 (9th Cir. 1992) (dismissal of *pro se* plaintiff's complaint for repeated failure to properly caption parties was not an abuse of discretion). Even if Fedorchak were a properly named defendant, he would be entitled to summary judgment based on the record before the Court.

---

[1] Officer Fedorchak's name was disclosed as part of Defendant's Fed. R. Civ. P. 26(a)(1) disclosure, as well as on the "Incident Report" from Plaintiff's arrest, which names "Richard L. Fedorchak" as the arresting officer. Plaintiff now seems to understand that the officer involved was Fedorchak (see Pl. SOAF ¶¶ 15-24), and knew at the time of his deposition that Mr. Columb was the building engineer (see Pl. Dep. at 39-40).

As it now stands, Plaintiff's amended complaint commingles citations to, and analysis of, the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*) ("ADA" or "the Act") with facts about the incident that led to his arrest and with at-times unspecified references to his civil rights. Read with a searching eye, Plaintiff alleges that (i) he attempted to use a public toilet but was denied access and not shown to an alternative facility in violation of the ADA (Compl. ¶¶ 4-5, 16); (ii) that he was unlawfully detained and arrested by the police (Compl. ¶¶ 12-15, 25), (iii) that police used "excessive force" in using four pairs of handcuffs to arrest him after "[i]n 'urgency' [to use the bathroom, he] unzipped [his] fly behind a light post" while he was being detained (Compl. ¶ 15); and (iv) that he was discriminated against based on his race (Compl. ¶ 16, 28).[2]

Plaintiff seeks more than $30.5 million in damages, but would accept a settlement of about $15 million "and a public apology." Compl. ¶ 26. On June 5, 2008, Defendant filed a motion for summary judgment [77].

## II. Facts

### A. Local Standards on Summary Judgment

The Court takes the relevant facts from the parties' respective Local Rule ("L.R.") 56.1 statements of material fact: Defendant's Statement of Facts ("Def. SOF") [77], Plaintiff's Statement of Additional Facts ("Pl. SOAF") [81], and Defendant's Response to Plaintiff's Statement of Additional Facts ("Def. Resp. Pl. SOAF") [83].

---

[2] Plaintiff also makes additional claims that have been dismissed: (v) that he was never read Miranda warnings (Compl. ¶ 19), (vi) that once he was in custody the police did not let him use the bathroom for forty-five minutes (Compl. ¶ 19); (vii) that police committed "obstruction of justice" by making a photocopy of Plaintiff's license (and inaccurately recording Plaintiff's name on a police report) in violation of Illinois criminal law (Compl. ¶¶ 23-24). These claims are no longer before the Court, having been dismissed by Judge Moran. See [30], [50].

Local Rule 56.1 requires that statements of fact contain allegations of material fact, and that the factual allegations be supported by admissible record evidence. See L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. at 583-85 (N.D. Ill. 2000). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. See, *e.g.*, *Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider the statement. See, *e.g.*, *Malec*, 191 F.R.D. at 583. Additionally, where a party improperly denies a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. See L.R. 56.1(a), (b)(3)(B); see also *Malec*, 191 F.R.D. at 584. The requirements for a response under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000). In addition, the Court disregards any additional statements of fact contained in a party's response brief but not in its L.R. 56.1(b)(3)(B) statement of additional facts. See, *e.g.*, *Malec*, 191 F.R.D. at 584 (citing *Midwest Imports*, 71 F.3d at 1317).

Plaintiff failed to file a response to Defendant's Statement of Facts as L.R. 56.1(b)(3) requires, despite Defendant's compliance with the *pro se* notice requirements of L.R. 56.2. Pursuant to that rule, Defendant provided Plaintiff with notice [80] about Plaintiff's need to comply with L.R. 56.1, specifically stating, "[i]f you disagree with any fact offered by the defendant, you need to explain how and why you disagree with the defendant * * * If you do not do so, the judge will be forced to assume that you do not dispute the facts which you have not

responded to." Because of Plaintiff's failure to submit responses to Defendant's statement of facts, the Court deems admitted each of Defendant's fact statements. See, *e.g.*, *Dale v. Poston*, 548 F.3d 563, 568 (7th Cir. 2008) (upholding district court's decision to disregard *pro se* litigant's L.R. 56.1 statement); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[T]he Supreme Court has made clear that even *pro se* litigants must follow rules of civil procedure.") (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)); *Greer v. Bd. of Educ.*, 267 F.3d 723, 726 (7th Cir. 2001); *Walridge v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994) (failure to comply with L.R. 56.1 is "not a harmless technicality").

However, like the plaintiff in *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003), Plaintiff "should not feel too bad about" deeming admitted Defendant's statement of facts, "because it * * * appears that most of the relevant, material facts submitted by [Defendant] * * * are not disputed." Defendant's L.R. 56.1 Statement of Facts based 43 out of 49 fact statements on Plaintiff's deposition testimony. Moreover, this memorandum opinion and order describes the extent to which the other six statements do not comport perfectly with Plaintiff's version of events and concludes that the differences are immaterial. Further, the Court has taken into consideration Plaintiff's Statement of Additional Facts and the limited evidence that Plaintiff has presented as exhibits to his pleadings, and has broadly construed the contentions set forth in Plaintiff's complaint, briefs, and other submissions given Plaintiff's *pro se* status. Yet, short of a fact statement that somehow could undo Plaintiff's deposition testimony, it is difficult to conceive of any set of facts that would prevent summary judgment in favor of Defendant.

## B.    Relevant Facts

Although Plaintiff is blind in his right eye, he has 20/30 vision out of his left eye. Def. SOF ¶ 10-11. He can read if he removes his glasses and places the paper roughly half a foot

from his face. Def. SOF ¶ 10. He lives and travels alone, and, according to Plaintiff, no one can tell that he suffers visual impairment unless he offers up the information. Def. SOF ¶¶ 12, 13.

On September 24, 2005, at approximately 6:40 p.m., Plaintiff arrived in Chicago's Union Station aboard a train from Texas. Def. SOF ¶¶ 2, 15; Compl. ¶ 4. After disembarking, Plaintiff was directed to a restroom (by someone who was not an Amtrak employee). When he arrived at the restroom, a maintenance worker informed Plaintiff that the restroom was closed. Def. SOF ¶¶ 16-17; Pl. Dep. at 29. Plaintiff did not ask for the location of another restroom and the maintenance worker did not volunteer such information. Def. SOF ¶ 18; Pl. Dep. at 31-33. Plaintiff turned around to leave and, on the way out, encountered a second maintenance worker and a building engineer. Def. SOF ¶¶ 18-19.

The record evidence with regard to what happened next – what might be called "the Bathroom Confrontation" – diverges slightly, although the discrepancies do not ultimately affect the Court's ability to resolve this dispute on summary judgment.

*Plaintiff's Version of the Bathroom Confrontation.* Plaintiff says that he was on his way out of the restroom when he spoke with the second maintenance worker and identified himself as both visually impaired and in need of a restroom. Pl. Dep. at 37. According to Plaintiff, this second maintenance worker offered no assistance, gave a "smirky look" and told Plaintiff, "[I]f you don't pull the [restroom] gate down, I will call Amtrak police on you and tell them you broke the gate." *Id.* At this point, Plaintiff was standing outside the bathroom, and a building engineer (Michael Columb) came over. *Id.* at 39-40. Plaintiff claims that Columb and the second maintenance worker "taunt[ed]" Plaintiff by questioning whether Plaintiff was really on disability. *Id.* at 42-43. Plaintiff never asked if there was another bathroom that he could use (*id.* at 91), and he left the bathroom shortly after having "politely told [Columb] * * * you better

thank God I'm visually impaired on Social Security disability, because if I wasn't, I would whoop your ass." *Id.* at 43. Plaintiff then called his mother from a payphone (*id.* at 50) and was followed out of the building by Columb "because of what I told him" (*id.* at 47). As he was about to leave in a cab, Columb and the second maintenance man said "stop that man" to a police officer. *Id.* at 55. The officer told the cab driver not to leave with Plaintiff or he would have the driver's license revoked. *Id.* at 58.

*A Slightly Different Version of the Bathroom Confrontation.* Some of the record evidence tells a different story. According to Edwin Aleman, the second maintenance man, he was supervising the cleaning of the bathroom; the security gate "which pulls down from the ceiling was down and locked, barring access to the restroom while it was being cleaned."[3] Aleman Aff. ¶ 2. Plaintiff approached the gate, "became visibly upset when [Aleman] told him the restroom was closed for cleaning * * * [and] grabbed the gate with his hands and began to violently shake it back and forth causing it to bend." *Id.* at ¶ 4. In response to the disturbance, Officer Richard Fedorchak received a call on his radio. Fedorchak Aff. at ¶ 2. He proceeded through the food court area and out onto Adams Street to investigate the disturbance, which is where he found Plaintiff "shouting at Mr. Columb." *Id.* at ¶¶ 3-4. Columb informed Officer Fedorchak that Plaintiff tried to force open a locked bathroom gate and that Plaintiff had threatened to "beat [Mr. Columb's] ass." *Id.* at ¶¶ 5-6 (brackets in original). Based on what he heard from Mr. Columb, Officer Fedorchak "detained Mr. Johns in order to further investigate the statements made by Mr. Columb." *Id.* at ¶ 7.

* * *

---

[3] Note that on this version of events, Plaintiff apparently never would have met with the first maintenance worker.

The evidence substantially reharmonizes at this point. Plaintiff climbed out of the cab after Officer Fedorchak arrived. Def. SOF ¶ 35. Plaintiff tried to tell the officer that he was visually impaired, not getting assistance, and trying to use the restroom, during which time the officer was talking to the maintenance man and the engineer. Def. SOF ¶ 36; Pl. Dep. at 59, 61. During the (apparently overlapping) conversations, Officer Fedorchak told Plaintiff to "shut up." Def. SOF ¶ 36. Plaintiff told the officer that he urgently needed to go to the bathroom, which is when the officer told Plaintiff that he would be arrested if he urinated in public. Def. SOF ¶ 37. Plaintiff, however, walked over to a light post, undid his belt buckler, undid his pants' button, and unzipped his zipper—at which point he was arrested. Def. SOF ¶ 38, 40.[4]

Although Plaintiff was not thrown to the ground, hit, or beaten, a total of five officers allegedly emerged and placed a total of four handcuffs on Plaintiff and escorted him to the police station. Def. SOF ¶¶ 43-45. Plaintiff stated that the handcuffs were tight (Pl. Dep. at 71), but he sustained no bruises, cuts or broken bones, and he needed no medical treatment (Def. SOF ¶ 46). Plaintiff, however, claims that he sustained "physical trauma" in the form of his "physical urges to hold[back]" his desire to urinate. Pl. Dep. at 77-78. He likewise claims emotional trauma over "being detained from using the washroom." *Id.* He has not experienced any psychological problems since his arrest (*id.* at 99).

All of this took place over a course of about twenty-five minutes. Plaintiff's train arrived at Union Station at 6:40 p.m. Def. SOF ¶ 15. The record does not account for every minute, but according to Officer Fedorchak, about two minutes passed between when he approached Plaintiff and when he allegedly exposed himself. Def. SOF ¶ 42. And Plaintiff was handcuffed in the police station by 7:05 p.m. Def. SOF ¶ 49.

---

[4] There is another minor discrepancy here: Officer Fedorchak says that Plaintiff exposed himself, at which point Plaintiff was arrested for public indecency. Fedorchak Aff. at ¶ 9.

## III.     Standards on Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In turn, summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. And the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S at 252.

**IV.    Analysis**

    **A.    Americans with Disabilities Act Claim**

Plaintiff presents very little in the way of legal argument, but his conception of the alleged ADA violations is straightforward: Amtrak violated the ADA by denying him access to the restroom in Union Station (compl. ¶ 4-5) and because Amtrak's workers did not "offer[] or directly show[] him to another facility" (Pl. Dep. at 94).  Both arguments fail to past muster under the ADA on the facts of this case.

The Americans with Disabilities Act was enacted in 1990, after Congress determined that "many people with physical or mental disabilities" have been prevented from "participat[ing] in all aspects of society" and "have been subjected to discrimination."  42 U.S.C. § 12101(a)(1).  For purposes of the Act, the word "disability" includes "a physical or mental impairment that substantially limits one or more major life activities" and also includes "being regarded as having such an impairment."  *Id.* at §§ 12102(a)(1)(A), (C); 12102(a)(3); see also *id.* at § 12102(a)(1)(B).

Of particular pertinence, the Act contains an anti-discrimination provision with respect to "public entities."  By law, Amtrak is a public entity.[5]  The plain language of the anti-discrimination provision requires a nexus between the complained-of discrimination by the public entity and an individual's disability:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or *be subjected to discrimination* by any such entity.

42 U.S.C. 12132 (emphasis added).  Failure to make bathrooms, telephones, and drinking fountains "readily accessible to and usable by individuals with disabilities" is considered

---

[5] Amtrak specifically is included in the definition of "public entity."  42 U.S.C. § 12131(1)(A).

discrimination under Section 12132. *Id.* at § 12147. Federal regulations further describe the contours of the statutory provisions, stating that "[a] public entity shall maintain in operable working condition those features of facilities and equipment that are required [by the ADA] to be readily accessible to and usable by persons with disabilities." 28 C.F.R. § 35.133(a). However, that regulation "*does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs.*" *Id.* at § 35.133(b) (emphasis added). See also 28 C.F.R. § 35.130 (general prohibitions against discrimination); *Wisc. Cmty. Svcs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751 n. 10 (7th Cir. 2006) (noting that these regulations, promulgated by the Department of Justice, are entitled to "respect" if not *Chevron*-type deference).

To summarize then, the statutory and regulatory provisions that are on point (i) make it illegal for Amtrak to subject an individual to discrimination because of his or her disability (42 U.S.C. 12132); (ii) require Amtrak to ensure that its bathrooms are accessible to those individuals who have disabilities (42 U.S.C. § 12147); and (iii) provide a safe-harbor of sorts for Amtrak to temporarily close its bathrooms for maintenance or repairs (28 C.F.R. § 35.133(b)).

Viewing the facts in the light most favorable to Plaintiff, his ADA claims fail. Plaintiff's deposition testimony establishes at most that: (i) the bathroom was closed for cleaning, (ii) Plaintiff informed various personnel that he was visually impaired, (iii) Plaintiff neither asked to use an alternative facility nor was he directed to one,[6] and (iv) that Aleman and Columb did not believe that Plaintiff was handicapped, which Plaintiff equated to "taunting" him about not being handicapped.

First, the fact that the bathroom was closed for cleaning simply does not, without more, violate the ADA. See *Hernandez v. Chinn*, 2006 WL 2331131, at *2 (E.D. Cal. Aug. 10, 2006)

_____

[6] Aleman states that he suggested that Plaintiff "try one of the two restrooms on the lower level." Aleman Aff. at ¶ 3.

(inability to "get into" a restroom that was closed for cleaning would not violate the ADA); *Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d. 1134, 1149 (S.D. Cal. 2006) (absence of public restroom for disabled and nondisabled alike does not violate ADA). By Plaintiff's own account, he was told by the first maintenance worker whom he encountered that the bathroom was closed, and Plaintiff did not ask about the location of another bathroom. Nor did he ask anyone else. Put simply, Plaintiff has offered no evidence to suggest a nexus between his disability[7] and the denial of access to the restroom, as the plain language of Section 12132 requires. See also *Wisc. Comty. Svcs., Inc. v. City of Milwaukee*, 465 F.3d at 751 (discrimination under Section 12132 requires "but for" causation). Indeed, the regulatory safe harbor described by 28 C.F.R. § 35.133(b), which is entitled to "respect" by the Court (*Wisc. Cmty. Svcs.*, 465 F.3d at 751 n.10), can be seen as a commonsense assessment that, at least in the mine-run of cases, routine maintenance will not amount to discrimination "by reason of" (42 U.S.C. §12132) an individual's disability. The Court discerns no reason, and Plaintiff provides no argument, for upsetting that assessment in this case.

Second, inasmuch as Plaintiff's complaint is that Amtrak failed to accommodate his disability, that argument, too, is not well-taken. *Refusal* to accommodate may serve as an independent basis of liability under the ADA. See, *e.g.*, *United States v. Georgia*, 546 U.S. 151, 157 (2006); *Wisc. Cmty. Svcs*, 465 F.3d at 753; *Dadian v. Village of Wilmette*, 269 F.3d 831, 838-39 (7th Cir. 2001); 28 C.F.R. § 35.130(b)(7). Yet, the Court is aware of no case in which a failure to accommodate was successfully argued without an accompanying request to accommodate. Indeed, the case law in this realm presupposes a request. See *Baert v. Euclid*

---

[7] The Court need not decide whether Plaintiff was disabled for purposes of the ADA but notes that monocular vision is not a per se disability under the ADA. See *Albertson's, Inc. v. Kirkinburg*, 527 U.S. 555, 566 & n. 12 (1999) (agreeing that people with monocular vision ordinarily will meet the definition, but holding that disability must still be proved).

*Beverage, Ltd.*, 149 F.3d 626, 632, 633 (7th Cir. 1998) (describing as an "interactive process" the making of accommodations in the under the ADA in employment cases); *Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1012 (7th Cir. 1997). And the Seventh Circuit teaches that determining whether a *requested* accommodation is reasonable "is highly fact specific, and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the Plaintiff." *Dadian*, 269 F.3d at 838; *Washington v. Indiana High Sch. Athletic Ass'n*, 181 F.3d 840 (7th Cir. 1999) ("*refusal* to make a reasonable accommodation" is a basis for liability under the ADA) (emphasis added). But Plaintiff specifically states in his deposition that he did not ask for an accommodation (see Pl. Dep. at 91) – that is, there was no request for Amtrak to refuse in the first place.

Moreover, even had Plaintiff made a request, Defendant would be entitled to summary judgment because Plaintiff does not argue that it would have been any more difficult for him to find another restroom than for a non-disabled person. Indeed, Plaintiff acknowledged during his deposition that he can see "from [a] distance" when he travels because he wears eyeglasses (Pl. Dep. at 21). Based on the record evidence, no accommodation was necessary to avoid discrimination on the basis of Plaintiff's disability – and in any event Plaintiff did not ask for an accommodation.

Finally, Plaintiff's belief that he was taunted by the maintenance workers does not change the analysis. In Plaintiff's view, the taunting was that Amtrak's workers "didn't believe that I was on disability. In other words, you're saying he's not on disability, he's not – I don't believe him." Pl. Dep. at 42. Whether or not Plaintiff's version of events is true, the fact that the workers did not believe that Plaintiff was disabled does not create a jury triable issue, at least in this case. Neither the record nor Plaintiff's own arguments link the alleged disbelief about

Plaintiff's disability to either the initial denial of access or Aleman's and Columb's decisions not to offer (unsolicited) advice about the location of alternative restroom facilities.

### B.    Section 1983 Claims

In the view of the parties, most of Plaintiff's remaining claims are governed under 42 U.S.C. § 1983.[8]  (Amtrak treated Section 1983 as the relevant statutory provision from an early stage; Plaintiff invokes Section 1983 in its memorandum of law in opposition to summary judgment.)  Analyzing Amtrak's liability through the lens of Section 1983 may be appropriate, and it would appear to be Plaintiff's best chance of recovery given that Amtrak probably is not a proper defendant under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Several courts have ruled that Amtrak was a "state actor" for purposes of Section 1983.  See, *e.g.*, *DeSilvis v. Nat'l R.R. Passenger Corp.*, 97 F. Supp. 2d 459, 460 (S.D.N.Y. 2000); *Jacobsen v. Nat'l R.R. Passenger Corp.*, 1999 WL 1101299, at *3 (N.D. Ill. Nov. 29, 1999); *Greco v. v. Nat'l R.R. Passenger Corp.*, 2005 WL 1320147, at * 16 n. 38 (E.D. Pa. June 1, 2005).  And while the current version of the federal authorizing legislation for Amtrak grants the railroad the power to "employ rail police" (49 U.S.C. §24305(e)), Illinois law also authorizes "any registered rail carrier" to maintain a police force to "supplement the police forces of any municipality" (610 ILCS 80/2).

Thus, it appears that Amtrak and its police officers may be subject to liability under Section 1983 (the Court need not decide this question), and at least Amtrak's individual police officers[9] may be liable as federal agents based on *Bivens.  See Lebron v. Nat'l R.R. Passenger*

---

[8] As discussed below, there is some question regarding the basis for Plaintiff's claims of racial discrimination.

[9] Amtrak itself probably cannot be held liable on a respondeat superior theory under *Bivens*, as Judge Moran noted [50].  See also *Correctional Svcs Corp. v. Malesko*, 534 U.S. 61, 66-68 & n.3 (2001) (noting the Supreme Court's "retreat[] from [its] previous willingness to imply a cause of action where Congress

*Corp.*, 513 U.S. 374, 394 (1995) (Amtrak "is an agency or instrumentality of the United States for the purposes of individual rights guaranteed against the government by the Constitution"); *Bivens*, 403 U.S. at 395-97 (holding that petitioner had a cause of action for money damages under the Fourth Amendment against federal agents). Neither *Bivens* nor Section 1983 is itself a source of liability – rather each is a "means for vindicating federal rights conferred elsewhere." See *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979). In any event, the doctrinal differences that may attach depending on which route to liability is taken are of little moment when there is no underlying constitutional violation. See, *e.g.*, *Houskins v. Sheahan*, 549 F.3d 480, 493-94 (7th Cir. 2008) (no need to consider municipal liability under *Monell* when no underlying violation occurred). Such is the case here.

### 1. Unlawful Detention and "Unlawful Booking"

Plaintiff contends that he "was falsely arrested because they said I was causing a disturbance when I was not." Pl. Dep. at 95. Of course, being innocent of the crimes of which one is accused is not in and of itself actionable. See, *e.g.*, *Cobbledick v. United States*, 309 U.S. 323, 325 (1940) ("Bearing the discomfiture and cost of a prosecution for crime even by an innocent person is one of the painful obligations of citizenship.").

Officer Fedorchak had probable cause to arrest Plaintiff, which is an absolute defense to Plaintiff's unlawful detention and unlawful arrest claims. See *Wagner v. Washington County*, 493 F.3d 833, 836 (7th Cir. 2007); *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). The Supreme Court "repeatedly has explained that 'probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person * * * in the circumstances shown, that the suspect has committed, is committing,

has not provided one," and refusing to extend *Bivens* to impose liability on private entities acting under color of state law); *F.D.I.C. v. Meyer*, 510 U.S. 471, 484-86 (1994) (refusing to extend Bivens to actions against federal agencies).

*or is about to commit an offense.*" *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) (emphasis added).

Plaintiff does not dispute that Officer Fedorchak received a radio dispatch about a disturbance near the restroom. Def. SOF ¶ 31. Nor does Plaintiff challenge that Officer Fedorchak spoke with Michael Columb prior to detaining Plaintiff and that during that conversation Columb informed Officer Fedorchak that Plaintiff threatened to "beat [Columb's] ass" and had bent a locked gate. Def. SOF ¶ 32. Although there are discrepancies between Plaintiff's version of the Bathroom Confrontation and Mr. Columb's version, the probable cause determination is based on objective reasonableness as the facts would have reasonably appeared to the arresting officer (*Wagner*, 493 F.3d at 836), and so what matters is Columb's *apparent* credibility (see *Mustafa*, 442 F.3d at 548). Plaintiff has offered no basis for questioning the apparent credibility of Columb's report, which stated that Plaintiff had threatened Columb and damaged property. Indeed, Plaintiff has freely admitted to making a statement that could have been assault under Illinois law given that Columb was "in [Plaintiff's] face" at the time the statement was made. See 720 ILCS 5/12-1(a) ("A person commits an assault when, without lawful authority, he engages in conduct which places another in reasonable apprehension of receiving a battery"); Pl. Dep. at 42. In any event, Plaintiff has presented no evidence to undermine the conclusion that Officer Fedorchak had probable cause to arrest Plaintiff as Plaintiff was entering the taxi.

And given that Officer Fedorchak had probable cause to make an arrest, the circumstances certainly permitted him to do what he in fact did – temporarily detain Plaintiff while attempting to sort out the stories of Columb, Aleman, and Plaintiff. See *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (officer with articulable facts that criminal activity is afoot may conduct a

brief investigatory stop); *cf. United States v. Tilmon*, 19 F.3d 1221, 1225 (7th Cir. 1994) (police should use the "least intrusive means reasonably available to verify or dispel their suspicions"); *id.* at 1226 (permissible to require suspect to get out of his vehicle). Then, when Plaintiff later walked away from Officer Fedorchak (after about one or two minutes of being detained (Fedorchak Aff. at 10)), removed his belt buckle, and unzipped his fly, Fedorchak again had probable cause to conclude that Plaintiff was *about to* commit another crime. (This conduct by Plaintiff also could have bolstered Fedorchak's determination that probable cause existed to arrest Plaintiff for damage to property and for assault.)

### 2. Excessive Force

Plaintiff's next claim is that four sets of handcuffs amounted to excessive force.[10] Pl. Dep. at 97. During Plaintiff's deposition, he acknowledged that he was at no time beaten, hit, or thrown to the ground, nor did he sustain bruises, cuts, broken bones, or any other injury requiring medical treatment. Def. SOF ¶¶ 44, 46.

Four sets of handcuffs is a lot, and apparently quite rare. See *Lister v State*, 894 S.W.2d 771, 773 (Tex. App. 1994) (three pairs); *State v. Alexander*, 1986 WL 6976, at *1 (Ohio App. June 19, 1986) (two pairs). Yet, assuming Plaintiff's version of events is correct and that four sets of handcuffs were used on him, the Court is not aware of any authority for the propositions that the use of multiple pairs of handcuffs, by itself, constitutes excessive force. Claims of excessive force are analyzed under an objective reasonableness standard. *Graham v. Connor*,

---

[10] Plaintiff has also stated that the fact that his pants fell down while he was being escorted to the police station amounted to excessive force. However, Plaintiff acknowledged that he undid his belt buckle when he approached the light post and unzipped his pants. According to Plaintiff's deposition testimony, his pants fell down to his ankles while being escorted to the station. Officer Fedorchak retrieved the pants and held them up while they proceeded to the station. See Pl. Dep. at 72-75. Plaintiff alleges nothing more than that his pants fell and that the officers picked them up (and then held his pants for the remainder of the journey) (*id.*). In short, Plaintiff has articulated no basis for turning this brief, largely self-induced embarrassment into a constitutional violation.

490 U.S. 386, 388 (1989). The absence of physical injury is an important indicator that excessive force was not used but is not talismanic. See *McNair v. Coffey*, 279 F.3d 463, 468-69 (Cudahy, J., concurring). Courts have, for instance, found that police may be held to have used excessive force based on frightening displays of force. See, *e.g.*, *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1997) (no excessive display of force when police arrested four men suspected of domestic assault by "calling over twenty police officers to the scene, including a SWAT team armed with machine guns and an FBI hostage negotiator"). But not every show of force amounts to excessive force. For example, in *Wilkins v. May*, the Seventh Circuit noted that "merely point[ing] a gun at a suspect in the course of arresting him" does not give rise to a claim of excessive force. 872 F.2d 190, 194 (7th Cir. 1989).

Viewed in the light most favorable to Plaintiff, the police may have used redundant force, but they did not use excessive force. And while extra pairs of handcuffs may have been emotionally distressing to Plaintiff, "the fourth amendment does not duplicate the tort of negligent infliction of emotional distress." *McNair*, 279 F.3d at 467. Plaintiff, however, has not alleged even that much: he has alleged nothing more than the bare fact that four pairs of handcuffs were used to restrain him.

### 3. Racial Discrimination

Plaintiff's complaint also alleges racial discrimination. Viewed generously, his complaint could be read to allege that he was arrested because of his race. See Compl. ¶ 16. If so, the claim fails. *Mustafa*, 442 F.3d at 547 (probable cause to arrest acts as an absolute bar to Section 1983 even if arresting officer was allegedly motivated by racism). Plaintiff also alleges discrimination under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.* and

under 42 U.S.C. § 1981. Compl. ¶ 28. Plaintiff has presented no evidence that would make either provision applicable to the facts of this case.

### 4.    A *Monell* Claim?

Defendant includes arguments relating to Officer Fedorchak's conduct out of "an abundance of caution" (Def.'s Mem. Supp. Mot. Summ. J. at 10) and assumes that Amtrak's liability, if any, is based on the standards set forth in *Monell v. Dept. of Soc. Svcs. of the City of New York, et al.* (436 U.S. 658 (1978)) and its progeny. Defendant's supposition, however, is hardly warranted, and it seems therefore that Defendant's abundance of caution may have been its saving grace.

The Court's decision in *Monell* reversed its earlier ruling in *Monroe v. Pape*, which held that municipalities were not "persons" subject to liability under Section 1983. 365 U.S. 167, 187-92 (1961). The Court's decision in *Monell* reasoned that municipalities and other local government units could be sued under Section 1983, but only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690. However, the Court imposed this limitation of liability after an extensive analysis of the legislative history of the Civil Rights Act of 1871. Only after that extensive analysis, read against the plain language of Section 1983, was the Court able to conclude that municipalities could not be held liable on a theory of *respondeat superior*.

It is by no means self-evident that the factors counseling in favor of Section 1983 limitations that are present when the defendant is a governmental unit are present when the defendant is a non-municipal corporation. *Cf. Malone v. Corrections Corp. of Am.*, 553 F.3d 540, 542 (7th Cir. 2009) (alluding to undiscussed "potential problems" below associated with

suing a corporation under Section 1983, including "how the corporation could be held vicariously liable" for the misconduct of its agents). However, because Defendant argued that Officer Fedorchak committed no constitutional violations – and the Court agrees – Amtrak would escape liability under Section 1983 even if it would be liable on a *respondeat superior* theory of liability.

Assuming that "Amtrak Police Unit," or at least the National Railroad Passenger Corporation, is properly suable[11] under Section 1983, Defendant is not liable because Plaintiff has not suffered any constitutional violation. And in the event that Defendant is correct that *Monell* does provide the governing standard for determining Amtrak's liability, Defendant is correct that Plaintiff has failed to show that a constitutional violation occurred because of any official policy, custom, or practice. See, *e.g.*, *Montano v. City of Chicago*, 535 F.3d 558, 570-71 (7th Cir. 2008) (evidence relating to the single officer whose actions gave rise to an excessive force claim cannot establish a "widespread practice * * * that is so permanent and well settled as to constitute a custom or usage"). Nor has Plaintiff offered any evidence that would allow a failure to train claim (see generally *City of Canton v. Harris*, 489 U.S. 378 (1989)) to survive summary judgment. As Defendant points out, the "evidence is completely lacking here." (Def.'s Mem. Supp. Mot. Summ. J. at 9).

---

[11] See *Best v. City of Portland*, 554 F.3d 698, 698 n. * (7th Cir. 2009) ("a police department is not a suable entity under § 1983").

## V. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [77] is granted.


Dated: March 16, 2009

_____
Robert M. Dow, Jr.
United States District Judge